UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

NEW MEXICO TOP ORGANICS-ULTRA HEALTH, INC.,

     Plaintiff,

                               Case No. 1:17-cv-00599-JAP-LF

v.

LARRY KENNEDY, DAN MOURNING,
and RAINA BINGHAM, in their official capacities,

     Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

On May 31, 2017, Plaintiff New Mexico Top Organics – Ultra Health, Inc. (Ultra Health) filed suit against three New Mexico State Fair officials, Defendants Larry Kennedy, Dan Mourning, and Raina Bingham (collectively, Defendants), seeking damages, injunctive relief, and a declaratory judgment for alleged violation of its First Amendment right to free speech.[1] Specifically, Ultra Health alleged that Defendants impermissibly sought to restrict its constitutionally protected speech and engaged in viewpoint discrimination against Ultra Health by placing unreasonable restrictions on Ultra Health's exhibitor application for the 2017 New Mexico State Fair in violation of the First and Fourteenth Amendments to the United States Constitution.

On January 3, 2018, Ultra Health filed a motion for summary judgment (Doc. 30), asking the Court to enter judgment in its favor as to all claims. On February 9, 2018, Defendants filed a cross-motion for summary judgment (Doc. 34) asking the Court to find in favor of Defendants and to dismiss Ultra Health's complaint. On October 10, 2018, the Court granted partial

---

[1] *See* COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES (Doc. 1) (Complaint).

summary judgment in favor of Defendants on Ultra Health's claim for monetary damages, dismissing that claim as barred by the Eleventh Amendment. *See* Partial Summary Judgment (Doc. 43). On August 6, 2018 through August 7, 2018 the Court held a bench trial. Each party submitted Proposed Findings of Fact and Conclusions of Law.[2] Ultra Health also filed a trial brief, an option that Defendants declined.[3] After carefully reviewing the trial transcript and exhibits, the parties' briefing, proposed findings of fact and conclusions of law, and the relevant case law, the Court finds that Defendants' restrictions as applied to Ultra Health were unreasonable and violated Ultra Health's First Amendment right to free speech. Accordingly, the Court will enter judgment in favor of Ultra Health and will grant injunctive relief as detailed herein.

## **FINDINGS OF FACT**

1. Plaintiff New Mexico Top Organics-Ultra Health, Inc. is a New Mexico non-profit corporation licensed by the State of New Mexico Department of Health (NMDOH) to produce, distribute and dispense medical cannabis and cannabis-derived products to patients enrolled in the NMDOH Medical Cannabis Program under the Lynn and Erin Compassionate Use Act, NMSA 1978, §§ 26-2B-1 to -7 (the Act).

2. Leigh Jenke is the Director of Quality and Compliance as well as chairperson of the board for Ultra Health. (Tr. 5:14-18).

3. Duke Rodriguez is the founder and CEO of Ultra Health, LLC, Ultra Health's management company. (Tr. 5:24-6:4; 66:24-25).

4. "The purpose of the Lynn and Erin Compassionate Use Act is to allow the beneficial use of medical cannabis in a regulated system for alleviating symptoms caused by debilitating

---

[2] *See* PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (Doc. 53); DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (Doc. 54).
[3] *See* PLAINTIFF'S TRIAL BRIEF (Doc. 68).

medical conditions and their medical treatments" in the state of New Mexico. NMSA 1978, § 26-2B-2.

5.  Under the Act and implementing regulations, "[n]o officer, employee, or approved contractor of a licensed producer, approved manufacturer, approved courier, or approved laboratory, nor any qualified patient licensed as a producer or enrolled primary caregiver, shall be subject to arrest, prosecution, or penalty in any manner for the production, possession, distribution, or dispensation of cannabis in accordance with [state regulations] and the act." N.M.A.C. 7.34.3.25(A) ("Exemption from State Criminal and Civil Penalties for the Medical Use of Cannabis"). However, "[p]articipation in the medical cannabis licensing program by a licensed producer…does not relieve the producer…from criminal prosecution or civil penalties for activities not authorized" by regulation and the Act. N.M.A.C. 7.34.4.22(A).

6.  "Production of medical cannabis and distribution of medical cannabis [by a licensed non-profit producer] to qualified patients or primary caregivers shall take place at locations…described in the non-profit producer's production and distribution plan approved by the department[.]" N.M.A.C. 7.34.4.33(B).

7.  Cannabis is classified under Schedule I of the Controlled Substances Act (CSA), and therefore its possession and use are criminalized under federal law. *See* 21 U.S.C. § 812(c).

8.  Cannabis is also categorized as a Schedule I controlled substance under New Mexico law, NMSA 1978, § 30-31-6(C), and it is otherwise unlawful for a person to possess a Schedule I controlled substance or drug paraphernalia in New Mexico, NMSA 1978, §§ 30-31-23, 30-31-25.1. Under the Act, however, qualified patients and licensed producers are exempt from state prosecution for possession of cannabis or paraphernalia. NMSA 1978, § 26-2B-4.

9.  The State of New Mexico holds an annual fair at the Expo New Mexico Fairgrounds.

10. Defendant Larry Kennedy is the Chairman of the New Mexico State Fair Commission.

11. Defendant Dan Mourning is the General Manager of the New Mexico State Fair Expo New Mexico. (Tr. 217:17-19).

12. Defendant Raina Bingham is the concessions and commercial exhibits manager for the New Mexico State Fair. (Tr. 122:11-12).

13. The statutory purpose of the New Mexico State Fair is to "advanc[e] the agricultural, horticultural and stock raising, mining, mechanical and industrial pursuits of the state." NMSA 1978, § 16-6-4.

14. The State Fair Defendants also articulated a goal of "promot[ing] a safe and family friendly ticketed event while complying with all state and federal laws." (Pl. Ex. 21; Tr. 136:5-6). This goal is not explicitly stated in statute or regulation. (Tr. 138:13-24). However, in addressing conduct of concessionaires and exhibitors, the 2017 State Fair Vendor Manual affirms that, "[t]he New Mexico State Fair mission is to host a safe and family-friendly entertainment environment for the State of NM." (Pl. Ex. 2 at 17; Tr. 180:4-15).

15. The New Mexico State Fair is a separate government instrumentality managed by the State Fair Commission (Commission). *See* NMSA 1978, §§ 16-6-1, 16-6-4, 16-6-14.

16. The Commission is responsible for adopting and enforcing rules necessary to manage the State Fair. *See* NMSA 1978, § 16-6-4(B).

17. The Commission has the legislative authority to charge entrance fees for admissions, to lease stalls, stands, and restaurant sites, and "do all things which by the commission may be considered proper for the conduct of the state fair not otherwise prohibited by law." NMSA 1978, § 16-6-4.

18. The public must pay an entrance fee to gain admission to the State fairgrounds. Prospective vendors and exhibitors must apply to the State Fair to seek approval to have a display booth. Vendors and exhibitors whose applications are approved must pay a fee to the State Fair to set up their booths. (Tr. 253:3-13; Pl. Ex. 1).

19. All vendors and exhibitors who sign a space agreement contract must comply with the terms in their contract as well as with the terms in the manual that contains policies governing concessions and exhibits at the New Mexico State Fair. *See* N.M.A.C. 4.3.10.

20. The 2017 New Mexico State Fair Vendor Manual provided:

    The Fair reserves the right to prohibit the sale and display of any product the Fair deems objectionable. It will be the sole decision of the Fair to determine whether an item is offensive or in poor taste. The display, sale, or distribution of weapons (firearms, knives, mace, martial art items, chains, etc.), toy weapons, fireworks, drug-related merchandise or paraphernalia, pornographic materials, offensive wording or graphics of any type, and counterfeit or 'knock-off' items are prohibited unless authorized under the terms of the Space Agreement executed by the Fair.

    (*See* Doc. 57, Stipulated Fact. No. 4; Pl. Ex. 2).

21. This prohibited items provision has been included in the Vendor Manual since at least 2007. (Tr. 200:10-14).

22. The 2017 application form also stated: "Prohibited items include but are not limited to: firearms, knives, swords, mace, martial art items, fireworks, drug related merchandise or paraphernalia, pornographic materials, offensive wording or graphics, counterfeit or 'knock-off' items." (*See* Doc. 57, Stipulated Fact No. 5; Pl. Ex. 1).

23. Defendant Raina Bingham interprets "drug related merchandise or paraphernalia" to refer to "illegal drugs," including cannabis, the possession of which is unlawful under federal law. (Tr. 147:1-6; 185:15-24).[4]

24. Ms. Bingham is responsible for receiving, reviewing, and ultimately rendering a decision on the applications submitted by prospective vendors and exhibitors. (Tr. 124:25-125:8).

25. Generally, when Ms. Bingham has concerns about and rejects an application, the applicant is not offered a contract and, unless the applicant asks to speak to a supervisor about the rejection decision, the process stops with Ms. Bingham. (Tr. 125:9-19).

26. Ms. Bingham ultimately bases her decisions regarding whether a proposed booth is or is not family friendly on her own sensibility, but she uses the prohibited merchandise provision in the vendor manual as a guideline for making this determination. (Tr. 139:3-21).

27. In August 2016 Ms. Jenke applied on behalf of Ultra Health for exhibit space at the New Mexico State Fair. (Tr. 7:13-19). Ultra Health saw the 2016 State Fair "as an opportunity to educate…[w]e wanted to educate people on, you know, what are qualifying conditions here in the State of New Mexico, how you can apply for a card. You know, we like to facilitate, I guess—we like to facilitate proper use within a regulated system, and so reaching out to people in that kind of venue is…a really, really good opportunity." (Tr. 9:3-9). Ultra Health wanted people to see "how we make the medicine here, how it's grown, how it's cultivated, so patients and people that are interested in it can see where their medicine comes from. It was considered a little bit of kind of a science fair presentation for the public. We wanted to show how the manufacturing worked, where the plants were grown, how they are grown, what the facilities look like." (Tr. 9:10-18). Ultra Health deemed the State Fair "a perfect

---

[4] Throughout briefing Ultra Health highlights Defendants' inconsistency in interpreting whether the prohibited items provision referred to all drugs or just illegal drugs. Based on testimony at trial, the Court is satisfied that Defendants have consistently interpreted this policy to refer to drugs that are illegal under state and/or federal law.

venue" because medical cannabis is "an agricultural industry" within the state. Also, on the "manufacturing side," Ultra Health wanted to show the lab, how things are cultivated, and the different products that are made. (Tr. 9:19-10:9)

28. The second page of the Ultra Health's 2016 State Fair application listed items that Ultra Health intended to bring as "printed materials," "posters," "plants," "microscope," "post cards," "pens," "post-it notes," and "stress balls." (Pl. Ex. 3).

29. Ultra Health submitted a proposed booth set up design to the 2016 State Fair in a separate email after submitting its application. The proposed design indicated that Ultra Health would exhibit a "cannabis clone," "microscope," "educational materials on the medicinal and economic benefits of cannabis," a "rosin press lavender demonstration area," and a "secure area where people can view cannabis plants." (Pl. Ex. 3). A cannabis clone is a portion of the cannabis plant that is cut from the mother plant and used to start a successive cannabis plant. (Tr. 17:7-9).

30. Ms. Bingham did not recall reviewing the Ultra Health booth design prior to the 2016 State Fair. (Tr. 190:20-191:4; Tr. 192:1-7).

31. When booth space became available a few days before the start of the 2016 State Fair due to a cancellation Ms. Bingham contacted Ultra Health. "Understanding their desire to be part of the State Fair and also that they were poised and ready to jump in at last minute's notice, which many vendors at that point aren't prepared, but knowing that they had made it very clear that they were still interested in wanting to do that, they seemed like a good fit for that space." (Tr. 7:21-25; 191:5-25). The parties signed a space agreement contract for the 2016 State Fair. (Pl. Ex. 4).

32. On September 8, 2016, the first day of the State Fair, Ultra Health displayed a live cannabis plant in its exhibition space. (Tr. 15:22-16:6). State Fair officials learned of the plant and Ms. Bingham called Duke Rodriguez, CEO of Ultra Health, LLC, and "explained to him that [she] did not realize that that was their intention. And [she] explained to him also that had [she] realized this, the application would not have been approved the way that it was submitted. [Ms. Bingham] told him that we couldn't keep – that he could not have that plant in his booth, nor the pipes."[5] (Tr. 194:5-14).

33. Ms. Bingham was not aware of any decision by the State Fair to shut down Ultra Health's booth for the rest of the 2016 State Fair but did later become aware that Ultra Health had vacated the booth location. (Tr. 194:15-24). "Because of the misunderstanding," Ms. Bingham reimbursed the contract fees to Ultra Health. (Tr. 194:25-195:5).

34. It was New Mexico State Police officers who had approached the booth and told Ultra Health to pack everything and exit the premises. (Tr. 59:8-14). Ultra Health complied and did not return for the remainder of the 2016 State Fair. (Tr. 22:6-11; 195:21-24).

35. Ms. Bingham indicated that had Ultra Health removed the cannabis plant and the pipes, it would have been allowed to continue to discuss its message at the 2016 State Fair. (Tr. 189:12-17).

36. In January 2017, Ms. Bingham sent an email to all the 2016 State Fair vendor/exhibitor applicants, including Ultra-Health, inviting those past applicants to submit an application to be considered for participation in the 2017 State Fair. (Tr. 25:11-16; 130:13-23; Pl. Ex. 5).

---

[5] Ms. Jenke testified that an Ultra Health employee working at the booth on the first day of the fair "took it upon himself" to bring pipes with him that he sells at Ultra Health's stores. This was not authorized by Ultra Health senior management, and when management learned the pipes were there, the employee was told to put the pipes away. (Tr. 14:15-15:21).

37. On April 11, 2017, Ms. Jenke responded to Ms. Bingham's invitation by electronically submitting an application to host a booth at the 2017 New Mexico State Fair along with a visual schematic of the intended booth display. (Tr. 5:14-18; 25:12-24; Pl. Ex. 6).

38. On the second page of the application, Ultra Health listed the items it intended to bring, including a "cannabis clone," a "microscope," "educational materials," and a "rosin press lavender demonstration area." The column requesting the price of sale items was marked "N/A" indicating that Ultra Health did not intend to sell any items at the State Fair. (Pl. Ex. 6, Tr: 26:3-6; 27:19-28:5).

39. The design schematic also indicated that Ultra Health intended to present a "cannabis clone," "microscope," "educational materials on the medicinal and economic benefits of cannabis," "rosin press lavender demonstration area," and "secure area where people can view cannabis plants." (Pl. Ex. 6).

40. With the rosin press, Ultra Health intended to use lavender to demonstrate the process Ultra Health employs to squeeze rosin from cannabis to produce a purer substance for certain patients. (Tr. 26:15-27:18).

41. "Educational materials" were to include information on the qualifying conditions for and the process to obtain a medical cannabis card, information on how different cannabis strains and elements work in the body, and how the "medicine" is made. (Tr. 11:21-12:4; 26:11-14).

42. Ultra Health also intended to display video and images of its lab and growth facilities to demonstrate to the public how the medical cannabis is grown, how it is produced, and how the different products are manufactured. (Tr. 28:6-29:12).

43. Upon reviewing Ultra Health's 2017 application, Ms. Bingham noticed Ultra Health's intention to bring a cannabis clone. Believing this to violate the State Fair's prohibited items

provision pertaining to drug-related merchandise and paraphernalia, Ms. Bingham took the application to Mr. Mourning, then deputy general manager, and to Joseph Holloway, the State Fair's attorney. (Tr. 132:2-133:1).

44. Ms. Bingham, Mr. Mourning, and Mr. Holloway met to discuss how to proceed with Ultra Health's application. (Tr. 133:2-8). Following that meeting, Ms. Bingham called Ms. Jenke and informed her that the State Fair "could not accept the application as it was with the second page listing cannabis clone because of our prohibited merchandise paragraph but that [Ms. Bingham] would welcome a new second page that would fit within our guidelines." (Tr. 133:9-16).

45. In response, on April 28, 2017, Ms. Jenke sent an email to Ms. Bingham asking for a "list of what will not be allowed this year from Ultra Health at the State Fair." (Pl. Ex. 7). The email continued, "Our corporate office would like a list so we can be absolutely sure we don't have any miscommunication. Just a short bullet list will be fine." (Pl. Ex. 7; Tr. 30:1-15).

46. Ms. Bingham responded to Ms. Jenke's request via email on May 2, 2017 with language that Mr. Holloway had provided. (Tr.134:4-13). The email read as follows:

> You may not bring onto the EXPO New Mexico campus any and all cannabis and cannabis derived products including CBD products. You may also not bring any product that would be outside your New Mexico Department of Health approved distribution plan. Moreover, you may not bring any type of drug paraphernalia that could be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body any type of cannabis or other controlled substance. You are also precluded from displaying any image of the above restricted items in any way to include banners, flyers, clothing, or any other medium. Let me know. Thank You.

(Pl. Ex. 8; Tr. 31:1-18).

47. The list of items referencing "drug paraphernalia" was derived in part from the state statute criminalizing the possession, delivery, or manufacture of drug paraphernalia. *See* NMSA

1978, § 30-31-25.1. Under the Lynn & Erin Compassionate Use Act and implementing regulations, state licensed medical cannabis producers are exempt from certain criminal or civil penalties related to the production, possession, distribution, or dispensation of medical cannabis. N.M.A.C. 7.34.3.25(A); *see also* NMSA 1978, § 26-2B-4.

48. Ms. Jenke reviewed the list with other Ultra Health members, as well as the management company, and determined that the list of restrictions would preclude Ultra Health "from doing anything, showing anything." (Tr. 34:9-14). Ultra Health made the decision not to participate in the 2017 State Fair believing that "without the use of any demonstrative aids or anything…it just would not have been possible or worthwhile for us to go and try to inform people." (Tr. 37:1-7).

49. On May 8, 2017, Ms. Jenke sent an email to Ms. Bingham stating, "I wanted to let you know that we have decided against participation in the State Fair for 2017. The list of restrictions is too broad and I believe we would have trouble informing people about Ultra Health and the benefits of the alternative form of cannabis medicine under these restrictions." (Pl. Ex. 9; Tr. 37:12-18).

50. The State Fair interprets the list of restrictions to include a plastic bin, a shovel, and even a picture of a shovel because "[w]ithin the context of how that [item] is going to be used, it would fall underneath the paraphernalia clause." (Tr. 149:4-14).

51. By way of example, the State Fair would allow a picture of a tractor tilling a field in preparation for planting corn, but that same picture of a tractor would not be allowed in a booth to advance a message regarding the medicinal and economic benefits of medical cannabis in New Mexico if the tractor was tilling the field in preparation for planting cannabis seeds. (Tr. 206:22-17; 209:1-210:12; 219:9-18). The State Fair's focus is on the

context and what the machinery is going to be used for. (Tr. 207:24-25). Ms. Bingham defines "context" as "what it is you are trying to promote with the photograph." (Tr. 208:8-10).

52. The State Fair's position is that although cultivation of medical cannabis is a lawful agricultural pursuit under New Mexico state law, cannabis is not family friendly because it is designated as a Schedule I controlled substance under federal law. (Tr. 229:2-4; 232:10-15) (*See also* Tr. 233:5-7 ("That's the only reason that we have not allowed cannabis to be displayed at the State Fair, because it is still federally illegal.")). The State Fair does not want to be viewed as taking a position for or against an illegal drug but does not object to a booth educating the public about medical cannabis absent imagery. (Tr. 243:16-244:2, 245:10-246:9).

53. In 2017 the State Fair approved the exhibitor application submitted by the Heights Seventh Day Adventist Church. On its application, the Church indicated that it did not intend to sell anything but that it would have a health promotion display and literature to include: "spiritual, health, *anti-drug*, anti-tobacco educational booklets and pamphlets." (Pl. Ex. 14 (emphasis added); Tr. 162:12-25). Ms. Bingham agreed that "anti-drug literature" is "drug-related" and could be related specifically to "illegal drugs." (Tr. 162:23-163:3). Ms. Bingham did not review the anti-drug literature the Church intended to bring to the 2017 State Fair, noting that the application did not raise any concern because the Church had been a vendor at the State Fair for 15 years without issue. (Tr. 163:4-16). As a result, there is no evidence that the Church's anti-drug literature contained images of illegal drugs or of persons using illegal drugs.

54. Knives are also listed within the prohibited items provision of the 2017 State Fair Vendor Manual. In 2017 the State Fair approved the vendor application for Cutco Cutlery, a company that sells "cutlery, gardening tools, sporting knives, culinary tools, cookware, flatware, and scissors." (Tr. 164:3-9; Pl. Ex. 15). Despite being included in the list of items prohibited for display or sale, Cutco Cutlery was allowed to display and sell[6] its products at the 2017 State Fair because Ms. Bingham has the authority to waive item prohibitions if, in her opinion, the display or sale of an otherwise prohibited item is family friendly based on context and the intended use of the item for sale. (Tr. 166:13-25).

55. Ms. Bingham indicated that Cutco Cutlery has "been a vendor with us selling knives in the Manuel Lujan Building for over 15 years. So somewhere along the way, they were permitted to do this." (Tr. 167:5-9). She continued, "In this instance, because it's done year after year, it was not something I was concerned with because the precedence had already been set and the application was the same," but that if a new application came in that raised concerns, she would consult legal and management. (Tr. 168:1-6).

56. Determinations about whether the prohibitions are going to be enforced against a particular applicant "reverts back to the context of the items being requested." (Tr. 169:11-14).

57. Ultra Health ultimately chose not to resubmit an application for the 2017 New Mexico State Fair and on May 31, 2017 Ultra Health filed its Complaint (Doc. 1).

58. In its Complaint, Ultra Health asks the Court to issue a declaratory judgment "stating that the restrictions outlined in Defendant Bingham's May 2, 2017 email are unconstitutional" and that Defendants violated Ultra Health's First Amendment rights, and to "enter a permanent injunction barring enforcement of the restrictions outlined in Defendant Bingham's May 2,

---

[6] Individuals can purchase items from Cutco Cutlery to be shipped to their home address but may not leave the booth with the item in hand. (Tr. 164:12-16).

2017 email." Ultra Health also request attorneys' fees, costs, and expenses under 42 U.S.C. § 1988. (Doc. 1 at 16-17).

59. In Plaintiff's Motion for Summary Judgment (Doc. 30), Ultra Health stated that "Ultra Health does not challenge here the prohibition on actual cannabis plants or on actual cannabis products." By the accompanying footnote 4, Ultra Health clarified that, "Ultra health does not concede that the Fair can bar plants, but does not challenge that restriction at this time." The Court interprets this to mean that Ultra Health presently is asking the Court to limit Ultra Health's requested relief to the matters identified in the third and fourth sentences of Defendant Bingham's May 2, 2017 email message.

## CONCLUSIONS OF LAW

### I.    Jurisdiction & State Action

Ultra Health brings this action under the First and Fourteenth Amendments of the United States Constitution and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988. This Court has original jurisdiction over Ultra Health's claims under 28 U.S.C. § 1331. The United States District Court for the District of New Mexico is the appropriate venue for these proceedings under 28 U.S.C. § 1391(b) because the events giving rise to Ultra Health's claims occurred in New Mexico and all Defendants are New Mexico residents. Moreover, the New Mexico State Fair is a government instrumentality and all named Defendants, as employees of the State Fair, are state actors. Defendants acted under color of state law in all actions related to Ultra Health's 2017 State Fair application. (*See* Doc. 57, Stipulated Fact No.  7).

### II.    Permanent Injunction Standard

To obtain a permanent injunction, Ultra Health must show actual success on the merits of its First Amendment claims. *Amoco Prod. Co. v. Vill. Of Gambell,* 480 U.S. 531, 546 n. 12

(1987). Additionally, Ultra Health must demonstrate: (1) "irreparable harm unless the injunction is issued;" (3) "the threatened injury outweighs the harm that the injunction may cause the opposing party;" and (4) "the injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wagnon,* 476 F.3d 818, 822 (10th Cir. 2007). "An injunction must not be broader than necessary to remedy the underlying wrong." *Gerlich v. Leath*, 861 F.3d 697, 710 (8th Cir. 2016) (internal quotation marks and citation omitted).

### III.    Ultra Health's As-Applied First Amendment Challenge

To obtain injunctive relief, Ultra Health must first show actual success on the merits. Accordingly, the Court must evaluate Ultra Health's claims considering applicable First Amendment doctrine. Ultra Health challenges as unconstitutional the State Fair's restrictions in Ms. Bingham's May 2, 2017 email on Ultra Health's application for a proposed booth display at the 2017 State Fair.   The email can be apportioned into four categories of prohibitions: (1) cannabis and cannabis-derived products, including CBD products; (2) any product that would fall outside of Ultra Health's New Mexico Department of Health approved distribution plan; (3) "any type of drug paraphernalia that could be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body any type of cannabis or other controlled substance," ("implements used to grow and manufacture medical cannabis") and (4) images of all of the above prohibited items "to include banners, flyers, clothing, or any other medium." (Pl. Ex. 8; Tr. 134:12-136:2).   The Court notes that the record supports that Defendants would have allowed Ultra Health to participate in the 2017 State Fair

provided it displayed only printed materials without images.[7] The speech at issue, therefore, is Ultra Health's ability to display certain items and images at its State Fair booth to support its educational message pertaining to medical cannabis.

In its Motion for Summary Judgment (Doc. 30), Ultra Health clarified that although it does not concede that the State Fair can prohibit Ultra Health from displaying cannabis plants, it is not challenging the State Fair's prohibition "on actual cannabis plants or on actual cannabis products." (Doc. 30 at 11). Nor does Ultra Health appear to challenge Defendants' prohibition on display of products that fall outside of Ultra Health's state distribution plan. Rather, Ultra Health narrows its First Amendment challenge to the prohibition on the display of items listed in the third category and the prohibition of images of all the restricted items detailed in the May 2, 2017 email including images of cannabis plants and leaves.

The U.S. Supreme Court has delineated a three-step framework for analyzing the constitutional protections afforded to private speech on government property. *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788 (1985); *see also Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997) (summarizing the three-step First Amendment free speech analysis). The Court must first determine whether Ultra Health's proposed message constitutes

---

[7] Ms. Bingham agreed that had Ultra Health removed the cannabis plant and the pipes in 2016 it would have been allowed to continue to share its message absent prohibited items, and that similarly, if the 2017 application had not included the cannabis clone, Ms. Bingham would "have taken into consideration potentially accepting them to discuss their educational purpose." (Tr. 189:12-22). Indeed, Mr. Mourning testified that in 2016 the State Fair had a vendor through the sponsorship department that was a broker between patients seeking medical cannabis cards and doctors who perform evaluations to determine patient eligibility for the cards. (Tr. 266:11-267:1). Mr. Mourning testified that the vendor had initially displayed items at his booth that bore a cannabis leaf image, but the vendor removed the items when asked to do so and the State Fair allowed the vendor to stay and hand out literature without images. (Tr. 268:14-269:5). Mr. Mourning never saw the images he described in testimony. (Tr. 269:17-270:2). Additional trial testimony elicited from Mr. Mourning contradicts the notion that Ultra Health would have been allowed to present written educational materials without imagery. (Tr. 258:2-16). Nevertheless, the Court assumes, without deciding, that the State Fair would have allowed written materials without images and focuses only on the categories of prohibited items that Ultra Health challenges or that Ultra Health proposed to display at the 2017 State Fair. For this reason, the Court will not address, for example, items used to "inject, ingest, inhale, or otherwise introduce into the body" medical cannabis because Ultra Health did not propose to bring pipes or other similar items used to ingest or inhale cannabis.

speech protected by the First Amendment. *See Cornelius*, 473 U.S. at 797. Next, the Court must conduct a forum analysis to determine the proper level of scrutiny or standard to apply. *See id.* Finally, the Court must examine whether the regulation or policy at issue survives the applicable standard. *See id.*

A. <u>Nature of the Speech</u>

The First Amendment provides that "Congress shall make no law…abridging the freedom of speech." U.S. Const. amend. I. Although "[t]he First Amendment literally forbids the abridgement only of 'speech,'…the Supreme Court has 'long recognized that its protection does not end at the spoken or written word.'" *Cressman v. Thompson*, 719 F.3d 1139, 1148 (10th Cir. 2013) (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)). For example, an image can fall within the First Amendment's purview as symbolic speech if "it is sufficiently imbued with elements of communication." *Cressman*, 798 F.3d at 954-55 (10th Cir. 2015). That messages conveyed by certain communications "may be offensive to their recipients does not deprive them of constitutional protection." *Hill v. Colorado,* 530 U.S. 703, 714-15 (2000) (discussing that leafletting, sign displays, and oral communications of anti-abortion demonstrators was constitutionally protected speech); *see also Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) ("Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects…That is why freedom of speech, though not absolute,…is nevertheless protected against censorship or punishment." (citation omitted)).

This case does not turn on whether the content of Ultra Health's message to educate the public on New Mexico's medical cannabis program warrants First Amendment protection. The Court previously concluded on summary judgment, and the parties have not disputed, that Ultra Health's proposal to display items, images, and distribute written information regarding medical

cannabis, its products, and the State's medical cannabis program falls within the scope of protected speech contemplated by the First Amendment. *See* Memorandum Opinion and Order (Doc. 42). Moreover, the facts of this case show that Plaintiff's speech is private rather than commercial speech.[8]

B. Nature of the Forum

In evaluating the constitutionality of restrictions on speech that occurs on public property, different standards apply depending on the type of forum involved. *See Summum*, 130 F.3d at 913 (noting that "the extent to which the [State] may limit access to this property – i.e., whether a heightened or reasonableness standard applies – depends on its categorization"). The United States Supreme Court has "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic [or limited public] forum." *Cornelius,* 473 U.S. at 802. "When the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum, it creates a 'limited public forum.'" *Summum*, 130 F.3d at 916. A limited public forum exists when the government opens its property "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Christian Legal Soc'y Chapter of the U. of Cal., Hastings Coll. of the Law v. Martinez,* 561 U.S. 661, 697 n.11 (2010) (internal quotation marks and citation omitted).

In the First Amendment context, the Supreme Court has held that a state fair is a limited public forum. *See Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 651-55

---

[8] Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,* 447 U.S. 557, 562 (1980). "The Constitution…accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Id.* at 563. Noncommercial speech, however, does not become commercial speech simply because the speech involves the solicitation of donations or financial support. *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 384-85 (1973). In this case, although Ultra Health's message to fairgoers could possibly in new customers, Ultra Health proposed to convey a noncommercial educational message regarding medical cannabis.

(1981). Courts have extended this holding to county fairs. *See, e.g., Hodge v. Lynd,* 88 F. Supp. 2d 1234, 1240 (D. N.M. 2000); *Mood for a Day, Inc. v. Salt Lake Cnty,* 953 F. Supp. 1252, 1260 (D. Utah 1995). In this case, the New Mexico State Fair is operated by the government for the benefit of the public. Members of the public who wish to attend the State Fair must pay an admission fee and enter through gates. Prospective vendors and exhibitors must apply to the State Fair to display in a booth. Vendors and exhibitors whose applications are approved must also sign a contract and pay a fee to the State Fair to host a booth. The State Fair is statutorily limited in its purpose to the advancement of "agricultural, horticultural and stock raising, mining, mechanical and industrial pursuits of the state." NMSA 1978, § 16-6-4(A). On this record, the Court concludes, and the parties agree, that the New Mexico State Fair is a limited public forum.

C. Application of the Standard

Having concluded that the New Mexico State Fair is a limited public forum, the Court must next determine whether the restrictions Defendants placed on Ultra Health are valid. "Once it has opened a limited forum…the State must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995). The State may regulate the boundaries of the limited public forum it has created, but any government restriction on speech must be (1) reasonable in light of the purpose served by the forum and (2) viewpoint neutral. *Cornelius*, 473 U.S. at 806. "In other words, although content-based discrimination is permissible in a limited or nonpublic forum if it preserves the purpose of the forum, when the government moves beyond restricting the subject matter of speech and targets 'particular views taken by speakers on a subject,' such viewpoint discrimination is 'presumed impermissible.'" *Summum*, 130 F.3d at 917 (quoting *Rosenburger*, 515 U.S. at 829-30). Defendants bear the burden of justifying their restrictions on Ultra Health's right to free speech. *NAACP v. City of*

*Philadelphia*, 834 F.3d 435, 445 (3d Cir. 2016); *see also U.S. v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 816 (2000) (where "the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions"). Because the Court concludes that Defendants' restrictions as applied to the items and images that Ultra Health proposed to display at the 2017 State Fair were unreasonable, and therefore unconstitutional, the Court will not address whether the restrictions were viewpoint neutral.

"Reasonableness is a case-specific inquiry." *NAACP,* 834 F.3d at 448. The reasonableness of a subject-matter or speaker-based limitation in a limited public forum "must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809; *see also New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002) (noting that in a non-public forum, "the reasonableness of a particular regulation is determined by a fact-intensive balancing test that takes into account such factors as the uses to which the forum typically is put, the particular risks associated with the speech activity at issue, and the proffered rationale for the restriction" (citing *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 687-93 (1992) (O'Connor, J., concurring))). "[A] restriction on speech in a [limited] public forum is reasonable when it is consistent with the [government's] legitimate interest in preserv[ing] the property…for the use to which it is lawfully dedicated." *Int'l Soc'y for Krishna Consciousness, Inc.,* 505 U.S. at 688 (O'Connor, J., concurring) (internal quotation marks and citation omitted).

When assessing reasonableness, Courts may rely on "record evidence or commonsense inferences. First…the evidence or commonsense inferences also must allow us to grasp the purpose to which the [government] has devoted the forum. And second, the evidence or commonsense inferences must also provide a way of tying the limitation on speech to the

forum's purpose." *NAACP*, 834 F.3d at 445. Courts have also examined whether restrictions are based on a definite and objective standard. *See, e.g., Summum*, 130 F.3d at 919-20 (in the context of a limited public forum discussing that "unbridled discretion" in the hands of government officials "raises the specter of…viewpoint censorship") (internal quotation marks and citation omitted)); *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 499-500 (9th Cir. 2015) (noting that "exclusions must be based on a standard that is definite and objective" to "prevent arbitrary and discriminatory enforcement by [State] officials"). "To support the position that a restriction is reasonable, there must be evidence that the restriction reasonably fulfills a legitimate need." *Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cnty Sch. Dist.*, 880 F.3d 1097, 1105 (9th Cir. 2018). This requires more of a showing than does the traditional rational basis test. *Multimedia Pub. Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993).

To begin the reasonableness analysis, the Court must first determine the State Fair's purpose. The State Fair's primary and statutory purpose is to advance the agricultural, horticultural, manufacturing and industrial pursuits of the State of New Mexico. Defendants agreed at trial that cultivation of medical cannabis by a licensed producer in New Mexico fits squarely within the State Fair's statutory purpose. However, Defendants also advanced a secondary objective for the annual State Fair supported by the record which is to promote a safe and family friendly entertainment event. *See, e.g.,* Pl. Ex. 2 at 17; Tr. 180:4-15. With these limited purposes in mind, the Court will address whether the speech restrictions in this case are reasonable.

As a preliminary matter, the Court observes that Ultra Health does not bring a facial challenge to the prohibited items provision in the 2017 State Fair Vendor Manual and the

corresponding provision in the vendor/exhibitor application. And, as the Court noted in its April 10, 2018 Memorandum Opinion and Order (Doc. 42), the prohibition in the 2017 State Fair Vendor's Manual on drug related merchandise and paraphernalia is tucked among a list of other items that include weapons, fireworks, pornographic materials, and offensive wording and graphics of any type, the exclusion of which appears consistent with the State Fair's reasoning that the restrictions aid in furthering the State Fair's family friendly event objective. Rather, Ultra Health challenges Defendants' interpretation of the prohibition on "drug related merchandise and paraphernalia" as detailed in Ms. Bingham's email and applied to Ultra Health.

Because the Court is faced with an "as applied" rather than a facial challenge, it must examine the State Fair's "interest in preserving the forum for its designated uses in light of the actual or proposed use [Ultra Health] intended to make of the forum." *Hawkins v. City and County of Denver,* 170 F.3d 1281, 1290 (10th Cir. 1999). The record indicates that Ultra Health sought to host a booth at the 2017 State Fair to educate people about the New Mexico medical cannabis program and the benefits of medical cannabis. Ultra Health also wanted to demonstrate how and where medical cannabis is cultivated, and to show how cannabis can be manufactured into different products. Ultra Health planned to display several items at its booth including a microscope, rosin press, and educational materials. With the rosin press Ultra Health intended to demonstrate how oils are extracted from cannabis plants to make different concentrations of medicine. Ultra Health planned to use a lavender plant for the rosin press demonstration. Ultra Health proposed to bring printed materials and posters showing qualifying conditions for a medical cannabis card in New Mexico and the process for obtaining a card. The printed materials would also show how the different cannabis elements work in the body and the different forms medical cannabis can take such as edibles, pills, or concentrates. According to

the proposed booth design, the printed materials and posters would have included images of cannabis. Finally, Ultra Health wanted to show a video of its lab and growth facilities to demonstrate the scientific process behind the development of the final medicinal product. Presumably the video would also contain images of cannabis plants. Ultra Health did not propose to sell any products or merchandise at the 2017 State Fair.

Defendant Mourning clarified that, to his knowledge, the proposed restrictions on Ultra Health were not related to any safety concerns for the State Fair attendees. (Tr. 232:1-15). Defendants also avow that the State Fair allows the discussion of topics pertaining to "illegal drugs," Tr. 189:9-11, and "encourage[s] the education of people for medical cannabis," Tr. 258:5-7. Defendants' principal contention is that the restrictions on Ultra Health's application and proposed display booth were reasonable in light of the State Fair's purpose of promoting a family friendly event because medical cannabis – although exempt from prosecution under state law - is an illegal controlled substance under federal law. (Tr. 220:14-22; 232:10-15).

Ultra Health suggests that Defendants' rationale for restricting Ultra Health's State Fair display by deferring to the federal Controlled Substances Act (CSA) is unreasonable as a matter of state law. (Doc. 68 at 8). Ultra Health's position is that intra-state actors like the State Fair are required to adhere to state policy regarding medical cannabis rather than following "equivocal federal policy." To support this position, Plaintiff cites to two New Mexico Court of Appeals cases addressing workers' compensation claims. In *Vialpondo v. Ben's Automotive Services*, 2014-NMCA-084, ¶ 1, 331 P.3d 975, 976, the court considered whether, under the Workers' Compensation Act (WCA), NMSA 1978, §§ 52-1-1 to -70, "an employer and insurer must reimburse an injured worker for medical marijuana used pursuant to the Lynn and Erin Compassionate Use Act." The workers' compensation judge (WCJ) ordered the employer to

reimburse the employee for medical marijuana. *Vialpondo,* 2014-NMCA-084, ¶ 4. The employer appealed, arguing that the WCJ's order was contrary to public policy and "illegal and unenforceable" under federal law. *Id.* ¶ 1. The employer claimed that complying with the order would "essentially require" the employer to commit a federal crime. *Id.* ¶ 15.

The New Mexico Court of Appeals acknowledged that under the Supremacy Clause, any conflict between the state Compassionate Use Act and the CSA would be resolved in favor of the CSA. *Id.* ¶ 15. However, the court also noted what it viewed as "equivocal statements" from the Department of Justice regarding medical marijuana use and compared those statements with the "clear" public policy in New Mexico regarding the use of medical cannabis. *Id.* ¶ 16. Ultimately, the court affirmed the WCJ's order, declining to reverse it "on the basis of federal law or public policy." *Id.*

One year later, the New Mexico Court of Appeals addressed a similar issue. *See Lewis v. Am. Gen. Media,* 2015-NMCA-090, 355 P. 3d 850. The court reiterated that in *Vialpondo* it declined to reverse the WCJ's order "based on either federal law or public policy." *Id.* ¶ 26. The court had rested its *Vialpondo* decision in part on the employer's inability to show that it would have been required to violate a federal statute by complying with the order, and because "federal public policy was ambiguous in contrast with New Mexico's clear public policy expressed in the Compassionate Use Act." *Id.* ¶ 26. The *Lewis* court rejected the employer's argument that "the New Mexico laws and regulations are not sufficient to obviate Employer's exposure to violation of federal law," once again holding that the conflict between New Mexico and federal law did not support reversal of the compensation order, *Id.* ¶ 31. Unlike in *Vialpondo*, the employer in *Lewis* enumerated several statutes it believed it would be forced to violate.

The *Lewis* court determined that the employer's argument raised only speculation given Department of Justice and federal policy denoting that "medical marijuana is not in the list [of enforcement priorities]." *Id.* ¶ 32. The court discussed the federal Consolidated and Further Appropriations Act of 2015 which specifically stated that "[n]one of the funds made available in this Act to the Department of Justice may be used, with respect to the [s]tates of…New Mexico,…, to prevent such States from implementing their own State laws that authorized the use, distribution, possession or cultivation of medical marijuana." *Id.* The court upheld the WCJ's compensation order "[i]n view of the equivocal federal policy and the clear New Mexico policy as expressed in the Compassionate Use Act." *Id.*

Ultra Health contends that the logic of these two New Mexico state court cases exposes the unreasonableness of Defendants' rationale that their restrictions on Ultra Health are related to cannabis' status as a Schedule I controlled substance under federal law. Ultra Health argues, "[t]he *Lewis* case should have impressed upon all New Mexico state agencies that state agencies should follow New Mexico on cannabis, not blindly defer to ambiguous equivocal federal law." (Doc. 68 at 7). The Court disagrees. The holdings in *Lewis* and *Vialpondo* provide limited guidance for this Court in applying federal constitutional law to the State Fair's restrictions of speech in a limited public forum. At most, these cases illustrate that state courts would defer to state law in evaluating a defense that relies on federal law. They also highlight the conundrum faced by state officials in reconciling state and federal law pertaining to medical cannabis.

1. The State Fair's prohibition on display of implements used to grow and manufacture medical cannabis, and images of those items, is unreasonable

As the Court previously stated, the list of prohibitions in the 2017 State Fair Vendor's Manual reinforced by a similar list in the 2017 State Fair application is not facially unreasonable in light of the State Fair's goal of promoting a family friendly event. Where the family friendly

event justification begins to unravel is in Defendants' subjective, arbitrary, and overbroad interpretations of the prohibited items provision as detailed in Ms. Bingham's May 2, 2017 email and as applied to Ultra Health's 2017 State Fair application. Because the State Fair is a limited public forum, Defendants are surely free to exercise their discretion in determining which vendor and exhibitor applications comply with the State Fair's purposes. However, they must do so reasonably. *See PETA v. Gittens,* 215 F. Supp. 2d at 132. "[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status forum." *Hopper v. City of Pasco*, 241 F.3d 1067, 1076 (9th Cir. 2001). "A policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if the exceptions are haphazardly permitted." *Id.*

At trial, it became clear that other than the broad criteria listed in the State Fair Manual and on the application, there are no guidelines by which State Fair officials make determinations concerning what is and is not "family friendly." Ms. Bingham, and to a lesser degree Mr. Mourning, have unfettered discretion to conclude what constitutes "family friendly" by relying almost entirely on their subjective sensibilities and respective personal opinions. To the extent the prohibited items provision in the State Fair Vendor Manual serves as a guideline, that too can be waived by Ms. Bingham if she determines that an otherwise prohibited item is unobjectionable because of the item's context. As a result, the State Fair has inconsistently applied its own policy, creating exceptions to its written list of criteria for certain applicants while simultaneously relying on that same list of criteria to restrict Ultra Health. For example, Ms. Bingham approved Cutco Cutlery's 2017 State Fair application despite an explicit prohibition on knives. Ms. Bingham testified that even with a prohibition on firearms, the State Fair would allow a hunting and fishing store to display photographs of its merchandise, including

shotguns sold in its store. (Tr. 152:24-153:4). The Court can certainly distinguish between cooking knives and combat knives. However, contextual exceptions to the general prohibited items provision are troublesome and bear on the reasonableness of the State Fair's prohibitions as applied to Ultra Health. This is particularly true when Defendants claim that the discussion of medical cannabis, like kitchen cutlery or hunting, is an allowable State Fair topic. Yet, Ms. Bingham did not apply similar exceptions to the display of certain agricultural and manufacturing implements and their images that Ultra Health proposed to bring to the 2017 State Fair.

Additionally, Ms. Bingham approved the 2017 vendor application for Lemon Aid Organics, a purveyor of organic healthcare products, in which the company indicated that it planned to sell "Organic Hemp oil." (Pl. Ex. 13). Ms. Bingham testified that hemp is a product derived from cannabis. (Tr. 161:22-23). Notwithstanding testimony that the prohibited items provision has been consistently interpreted and applied to all applicants for years, Ultra Health was barred from bringing cannabis derived products to the State Fair by the language in the May 2, 2017 email. Yet, Lemon Aid Organics was not barred from selling hemp oil. Although Ultra Health is not challenging the State Fair's prohibition on the display of cannabis and cannabis derived products, and the Court makes no ruling on that matter, the Lemon Aid Organics example further refutes Defendants' claim that the prohibited items provision has been consistently interpreted and applied to all applicants since at least 2007. The absence of definite and impartial criteria for determining whether an item is family friendly, combined with evidence of inconsistent application, renders the policy as applied to Ultra Health unreasonable. *See Seattle Mideast Awareness Campaign,* 781 F.3d at 500 (determining that, standing alone, statutory "reference to material that is 'objectionable under contemporary community standards'

would be too vague and subjective to be constitutionally applied." However, the statutory section survived constitutional scrutiny because the statute's ultimate criterion - "reasonably foreseeable harm to, disruption of, or interference with the transportation system" - was an objective one set out in advance).

In addition to consistent application of its prohibited items policy, the record evidence or commonsense inferences offered by Defendants must provide a way of tying the Defendants' restrictions on Ultra Health's speech to the forum's "family friendly event" purpose. *NAACP*, 834 F.3d at 445. Defendants avowed that "illegal drugs" and education regarding medical cannabis are allowable topics for discussion at the State Fair. Therefore, presumably these subjects are not per se antagonistic to the State Fair's goal of fostering a family friendly environment. Still, some of Defendants' restrictions on specific portions of Ultra Health's proposed display are not reasonably connected to furtherance of the State Fair's family friendly objective.

Defendants' clarification at trial regarding what constitutes prohibited paraphernalia and images thereof, as expounded in Ms. Bingham's May 2, 2017 email, only heightens the unreasonableness of the restrictions on Ultra Health in light of the stated objective to promote a family friendly event. The State Fair prohibited Ultra Health from bringing "any type of drug paraphernalia that could be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body any type of cannabis or other controlled substance." This restriction extends to images of any of the above items. Under this standard, the State Fair specifically would have prohibited Ultra Health's anticipated display of the rosin press (used to convert, process, and prepare cannabis), the microscope (used to

analyze cannabis), and other implements Ultra Health uses to grow or manufacture medical cannabis. The State Fair would also have prohibited Ultra Health from displaying photographs or videos of Ultra Health's laboratory and production and growth facilities.

Ms. Bingham agreed that the restrictions encompass anything used to plant a cannabis seed, including a shovel or even a photograph of a shovel. (Tr. 149:4-14). Indeed, according to Ms. Bingham's testimony, prohibited drug paraphernalia could also include a plastic bin used to store the medical cannabis. (Tr. 149:4-14). And a picture of a tractor tilling a field to prepare it for planting corn would be allowed in a vendor's booth pertaining to corn, but the State Fair would prohibit the very same picture of the tractor tilling a field if placed in Ultra Health's booth because it would constitute paraphernalia in that context.[9] (Tr. 206:22-17; 209:1-210:12; 219:9-18). That the very same photograph of a tractor or display of an otherwise ordinary agricultural implement would suddenly be rendered "family unfriendly" when displayed in Ultra Health's booth is entirely unreasonable. Under Defendants' expansive interpretation of the restrictions on implements and their images, even the most innocuous items are rendered objectionable when displayed in the context of medical cannabis, a subject Defendants concede falls within the statutory purpose of the State Fair and is otherwise allowable. (Tr. 189:9-22; 229:2-4).

The record reflects that Defendants did not submit evidence sufficient to demonstrate that the prohibitions listed in Ms. Bingham's May 2, 2017 email are reasonably tied to the State Fair's purpose of creating a family friendly event. Defendants' evidence fails to show that Ultra Health's proposal to bring for educational purposes the rosin press, the microscope, implements

---

[9] Mr. Mourning appeared to retreat from Ms. Bingham's statements by indicating that such imagery would only be prohibited if a cannabis plant or other controlled substance was incorporated into the image. (Tr. 235:10-19). But Ms. Bingham is the primary decision maker. She clearly testified that the same exact image would be allowed or disallowed depending on the context of the booth in which it was displayed without reference to images of cannabis in the photograph. Moreover, the inconsistency in the State Fair Defendants' interpretations of a policy that has purportedly been instituted for over a decade only further heightens the Court's concern.

used to grow and manufacture medical cannabis, and images of Ultra Health's lab, growth and production facilities, would conflict with a family friendly atmosphere. Accordingly, the Court concludes that the State Fair's restrictions on Ultra Health's 2017 State Fair application to display implements used to grow and process medical cannabis and images of those implements as part of their educational message were unreasonable in light of the purpose of the State Fair and the surrounding circumstances. As a result, Defendants violated Plaintiff's First Amendment right to free speech.

2. The State Fair's prohibition on display of images of Ultra Health's medical cannabis plants is unreasonable

For many of the same reasons the Court concludes that Defendants' restrictions on the display of certain implements and images of those implements are unreasonable, the Court also finds that the prohibition on Ultra Health's display of images of medical cannabis plants and leaves is unreasonable. However, this prohibition requires the Court's special attention because of the emphasis the parties placed on this particular restriction. The Court's holding here is narrow.

Ms. Bingham testified that all vendors are prohibited from displaying images of cannabis. For example, she testified that if a State Fair employee observes a T-shirt with a marijuana leaf on it, the employee will ask the vendor to remove it. (Tr. 203:9-13). Responding to a hypothetical question, Ms. Bingham stated that the State Fair would have prohibited even the Drug Enforcement Administration from showing images of seized marijuana plants. (Tr. 188:1-4). Ultra Health argues that Defendants' discriminatory viewpoint towards Ultra Health's pro-medical cannabis message and Defendants' non-neutral application of their prohibition of cannabis images is exposed by the acceptance of the Heights Seventh Day Adventist Church's 2017 State Fair application. As part of its 2017 State Fair application, the Church indicated that it

planned to display anti-drug and anti-tobacco educational booklets and pamphlets. (Pl. Ex. 14). Ultra Health contends that if Defendants had evenly applied the prohibited items provision, Defendants would have asked to review the Church's proposed anti-drug literature before granting the Church a space agreement contract. (Doc. 38 at 13).

The Court disagrees. Ms. Bingham credibly testified that Ultra Health's 2017 application initially captured her attention because Ultra Health clearly indicated that it planned to bring a cannabis clone to the State Fair in violation of the prohibition on drug-related merchandise and paraphernalia. (Tr. 132:11-22). Standing alone, Ms. Bingham's initial interest in Ultra Health's 2017 application does not evidence discriminatory motive. Nor did Ultra Health submit any evidence to show that Defendants allowed the Seventh Day Adventist Church to display prohibited images of cannabis or other controlled substance in its literature while denying Ultra Health the same opportunity. Nonetheless, the Court need not reach a conclusion on viewpoint because the restriction on images of medical cannabis as applied to Ultra Health in this limited context is unreasonable.

In their summary judgment motion, Defendants note that fair attendees are people from various backgrounds with various viewpoints, and many "do not wish to expose themselves to the topic of drug use." (Doc. 35 at 6). Defendants continue that the prohibition on "displaying drug related merchandise, paraphernalia, or images of the same allows for those attending the Fair to learn about the various agricultural aspects of New Mexico without being exposed to the topic of drug use" and that "the display of the image [of cannabis] itself creates an atmosphere that" State Fair attendees do not want to be a part of. (Doc. 35 at 6). Mr. Mourning reiterated at trial that unwanted exposure to the topic of illegal drugs was a concern for the State Fair in the pursuit of its goal to host a family friendly event. (Tr. 247:11-248:8). "Cannabis was cannabis as

far as we were concerned," he stated. (Tr. 223:2) "You can't tell the difference in my opinion from an illegal cannabis [leaf] from [a] medical [cannabis leaf]." (Tr. 223:2-4). Mr. Mourning continued, "we think that [the presence of the image of a cannabis leaf] doesn't send a good family friendly message, and that cannabis is still an illegal drug." (Tr. 223:22-24).

In a limited public forum, the government may impose content-based restrictions on speech as a means of "avoiding controversy that would disrupt" the forum. *Cornelius,* 473 U.S. at 809. And "[n]o doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Entm't Merchants Ass'n,* 564 U.S. 786, 794 (2011) (internal citation omitted). "Speech that is neither obscene as to youth nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* (internal quotation marks and citation omitted).

Avoidance of controversial topics does not seem to be a valid concern for the State Fair which allows, for example, a pro-life group to host a booth at the State Fair. (Tr: 263:1-264:1). Moreover, Defendants agree that education regarding medical cannabis cultivated and produced by Ultra Health falls within the State Fair's statutory purpose. Defendants also repeatedly testified that the State Fair allows exhibitors to educate fairgoers on the topic of medical cannabis, suggesting that Ultra Health's message is not per se outside of the scope of the State Fair's family friendly event objective. Yet, Defendants simultaneously justify their restrictions on Ultra Health because cannabis, regardless of its proposed use, is unlawful under federal law. The incongruity of Defendants' testimony in which they recognize medical cannabis as an illegal drug at some points, while creating a distinction for medical cannabis at others, exacerbates the State Fair's inconsistent application of the prohibited items provision.

Mr. Mourning stated that "[c]annabis was cannabis" and a passerby viewing an image of a cannabis leaf could not distinguish between medical cannabis and other forms of cannabis. (Tr. 223:2-4). The same, however, could be said of a sporting knife or a shotgun viewed from afar. Yet, Ms. Bingham granted exceptions to the prohibited items provision for purveyors of these otherwise prohibited items because of their context. Having determined that Ultra Health's message regarding medical cannabis is a topic the State Fair will allow and falls within the forum's purpose, it is inherently unreasonable to restrict Ultra Health from presenting anything other than written material without images while granting exceptions to the criteria for other vendors and exhibitors.

In *People for the Ethical Treatment of Animals, Inc. v. Kansas State Fair Board*, the district court determined that the state fair's requirement that plaintiff place a shield around a video containing graphic images of animal slaughter at its state fair booth display was both reasonable and viewpoint neutral. 891 F. Supp. 2d. 1212 (D. Kan. 2012). The court found that the restriction imposed was constitutional because it was "minimal in nature and serv[ed] a rational government interest." *Id.* at 1227. The record supported the state fair's claim that it made a particular effort to market itself to youth and that it had historically excluded sexually explicit or offensive material on a politically even-handed basis. *Id.* Here, we are faced not with images of animal slaughter, but with the image of a plant cultivated for medicinal purposes by a licensed non-profit producer within a highly regulated system. All parties agree that the cultivation of this plant by a state licensed producer falls within the State Fair's statutory purposes. To the extent Defendants agree that Ultra Health's message is allowed at the State Fair, the State Fair has not deemed it intrinsically incongruous with its family friendly purpose. On this record, given the purpose of the State Fair and the surrounding circumstances, it was unreasonable for the State

Fair to prohibit Ultra Health from displaying images of medical cannabis it has cultivated as part of its New Mexico Department of Health distribution plan in order to convey its educational message pertaining to medical cannabis. In 2017, Ultra Health did not propose to bring merchandise for sale or to give away free items to fairgoers. Accordingly, this holding is limited to images of actual medical cannabis plants cultivated by Ultra Health as might occur in any video Ultra Health intended to show of its facilities and in any educational materials Ultra Health proposed to bring to the 2017 State Fair.

## PERMANENT INJUNCTION

"[T]he decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006). The Court, having determined that Ultra Health has demonstrated actual success on the merits of its First Amendment claims, also determines that Ultra Health has satisfied the test for a permanent injunction under *Prairie Band Potawatomi Nation v. Wagnon,* 476 F.3d 818, 822 (10th Cir. 2007).

First, the United States Supreme Court has stated that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 374 (1976). In the context of a request for preliminary injunction, the injury must be "both threatened and occurring" at the time of the plaintiff's motion for an injunction. *Id*. "The purpose of an injunction is to prevent future violations." *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1230 (10th Cir. 1997). Therefore, in the context of a request for a permanent injunction, there must exist "some cognizable danger of recurrent violation." *Id*. The Court finds that Ultra Health's injury was both "threatened and occurring," at the time Ultra Health filed its complaint seeking injunctive relief because the

application process for a display booth at the 2017 State Fair was then ongoing. Moreover, the State Fair is an annual event with a cyclical annual application process. Although the 2017 State Fair has come and gone (as has the 2018 State Fair) during the course of this litigation, there is a cognizable danger of a recurrent violation of Ultra Health's First Amendment rights when Ultra Health again applies to be an exhibitor in the future as appears to be its intention. The Court also finds that there is no other adequate remedy at law, such as monetary damages, to compensate for this First Amendment injury.

Next, the public interest favors an injunction whenever First Amendment rights have been violated. *See Pacific Frontier v. Pleasant Grove City,* 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."); *see also Hobby Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1147 (10th Cir. 2013) ("it is always in the public interest to prevent the violation of a party's constitutional rights"). Finally, a remedy in equity is warranted considering the balance of hardships between the parties. Ultra Health's participation in future New Mexico State Fairs will not substantially injure Defendants, while deprivation of Ultra Health's First Amendment rights presents a considerable injury as discussed above. The State Fair's interest in safeguarding its family friendly atmosphere would not be substantially imperiled by narrow injunctive relief. And, no extraordinary effort or cost will incur by allowing Ultra Health to host an educational display booth consistent with this Memorandum Opinion and Order and the terms of the exhibitor contract space agreement. In sum, all the permanent injunction factors are in Ultra Health's favor.

Nonetheless, the injunctive relief Ultra Health seeks in its complaint is too broad to be practicable, would provide little guidance to Defendants, and may result in future litigation. Consequently, the Court will narrow the scope of the requested relief and will enjoin Defendants

only from employing restrictions on display of specific items or images that Ultra Health actually proposed to bring to the 2017 State Fair as described below.

## CONCLUSION

The State Fair's restrictions (pertaining to display of implements used to grow and manufacture medical cannabis and any images of such items as well as images of medical cannabis plants) as applied to Ultra Health's 2017 State Fair application were unreasonable in light of the purpose of the forum and the surrounding circumstances and therefore violated Ultra Health's First Amendment right to free speech.

IT IS THEREFORE ORDERED THAT:

1. A separate judgment will be entered in favor of Plaintiff New Mexico Top Organics – Ultra Health.

2. If Ultra Health applies for a display booth at a future New Mexico State Fair, under 28 U.S.C. § 2202, Defendants will be enjoined from prohibiting Ultra Health from displaying:

    a. Implements used to grow, manufacture and process medical cannabis, including a microscope and a lavender rosin press;

    b. Images of implements used to grow, manufacture and process medical cannabis including a video of Ultra Health's laboratory, growth, and processing facilities; and

    c. Images of cannabis plants cultivated by Ultra Health as part of its producer license through the New Mexico Department of Health's Medical Cannabis Program.

3. Reasonable attorney fees and costs will be awarded to Plaintiff as the prevailing party under 42 U.S.C. § 1988.  Plaintiff must file an itemization of reasonable attorney fees and costs by January 30, 2019.

SENIOR UNITED STATES DISTRICT JUDGE